Filed 2/24/21  P. v. Smith CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DUSHAWNE EARL SMITH,<br><br>     Defendant and Appellant. | B305527<br><br>(Los Angeles County<br>Super. Ct. No. TA145980) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Dushawne Earl Smith was involved in a series of gang-related drive-by shootings. The jury convicted Smith of first degree premeditated murder with special circumstances (Pen. Code,[1] §§ 187, subd. (a), 190.2, subds. (a)(21), (a)(22)), attempted premediated murder (§§ 664, 187, subd. (a)), shooting at an occupied vehicle (§ 246), and possession of a firearm by a felon (§ 29800, subd. (a)). The jury also made true findings on firearm enhancement (§ 12022.53, subds. (d), (e)(1)) and gang enhancement (§ 186.22, subd. (b)) allegations. Smith was sentenced to life without the possibility of parole (LWOP) plus 25 years to life on the murder count. On appeal, Smith argues: (1) the trial court erred in instructing the jury on the defense of duress; (2) his LWOP sentence constitutes cruel and unusual punishment; (3) his ineligibility for a youth offender parole hearing under section 3051 denies him equal protection of the law; and (4) the imposition of the firearm enhancement on the murder count violates California's multiple conviction rule and double jeopardy principles. We affirm.

## BACKGROUND

### I. The Gang-related Shootings

This case arises out of a series of drive-by shootings committed by members of the Grape Street Crips. Smith and six codefendants were charged with murder, attempted murder, and other related crimes in connection with two of the shootings. Smith and codefendant Lykeem Marty were jointly tried on the charges before separate juries. Two other codefendants, Karnell

---

[1] All further statutory references are to the Penal Code.

Lawson and Deanthony Bradford, testified against Smith and Marty as part of plea agreements for reduced sentences.

The Grape Street Crips are a large gang in South Los Angeles. One of the gang's main rivals are the Bounty Hunter Bloods. Nickerson Gardens is a housing project located in an area controlled by the Bounty Hunter Bloods. Jordan Downs is another housing project about a mile away, and is a stronghold of the Grape Street Crips. A few weeks before the shootings in this case, a high-ranking member of the Grape Street Crips was murdered by a member of the rival Bounty Hunter Bloods.

On the night of August 3, 2016, a group of Grape Street gang members, including Smith, Marty, Lawson, and Bradford, gathered near Jordan Downs. Vernon Williams, a leader and shot caller for the gang, came up with a plan to retaliate against the Bounty Hunters by shooting and killing one or more of their members. At Williams's direction, the group got into three cars and stayed in communication using their cell phones. Williams and Bradford were in a Mercedes, the lead car, and looked for potential targets. Three other men were in a Lexus, the decoy car, that would try to draw the attention of any police officers responding to the shooting. Smith, Marty, and Lawson were in a Nissan, the designated shooting car and the only one containing firearms. Marty drove the Nissan, and Smith and Lawson sat in the backseat. All three occupants of the Nissan were armed.

The group first drove in a caravan to the Howard Hughes Center in Culver City where Williams believed they would find Bounty Hunter Bloods. Williams directed the group to the driver of a Maserati whom he identified as a rival gang member. Smith, Lawson, and Marty all shot at the Maserati's occupants.

3

The driver of the Maserati was treated for multiple gunshot wounds.

Following this shooting, the group retrieved an AK-47 assault rifle. Because Williams was not satisfied with the shooting, all three cars then headed to Nickerson Gardens searching for another target. After scouting the area a few times, Marty stopped the Nissan near a field where a group of people had congregated. Lawson fired a pistol at the group until the chamber was empty. Several bullets hit a nearby home. Smith, who had been given the AK-47, struggled to cock the rifle and was unable to fire any shots. No injuries were reported as a result of that shooting.

The caravan of cars next went to a nearby park. Williams told the group that they were not done because no one had been killed. After Williams helped Smith cock the AK-47, the group headed toward a gas station across the street from Nickerson Gardens. From the Mercedes, Williams or Bradford identified the driver of a white Chrysler at the gas station as another potential target.

Dougal Cordero was the driver of the Chrysler and his girlfriend, Ijeoma Chukwudi, was also in the car. A third person, Paul Richmond, was standing nearby. Smith said, "[W]hat's up cuz?" then immediately opened fire with the AK-47, killing Cordero and wounding Chukwudi and Richmond.

## II.  **The Police Investigation**

Soon after the shooting at the gas station, officers stopped the Lexus, and took its occupants into custody. The following night, other officers pulled over the Nissan and arrested its occupants, Marty and Smith.

4

After the arrest, Smith admitted to a detective that he was part of the group of Grape Street gang members that committed the shootings at Nickerson Gardens and the gas station as revenge for the murder of one of their members. According to Smith, Williams and another member of the gang forced him to participate in the shootings. They physically assaulted Smith and took his property. They then held him at gunpoint and told him to get into the Nissan with Marty and Lawson. They also made Smith put an AK-47 rifle in the backseat of the car. During the interview, Smith gave a number of inconsistent statements about where he was seated in the Nissan. He claimed, however, that Marty and Lawson shot at the crowd in Nickerson Gardens, and Lawson fired the AK-47 at the couple at the gas station. While Smith denied firing a gun, he admitted he cocked the AK-47 for Lawson prior to the shootings.

## III.  The Plea Agreements for Lawson and Bradford

After being charged in this case, Lawson and Bradford entered into plea agreements under which they would receive reduced sentences in all cases pending against them in exchange for their truthful testimony. Lawson, who was 18 years old at the time of the shootings, would receive a total determinate term of 28 years, making him eligible for parole in 13 years. Bradford, who was 19 years old at the time of the shootings, would be sentenced to a nine-year term.

## IV.  Jury Verdict and Sentencing

The jury found Smith guilty of the first degree murder of Cordero (§ 187, subd. (a)), the attempted willful, deliberate, and premeditated murders of Chukwudi and Richmond (§§ 664, 187, subd. (a)), shooting at an occupied vehicle (§ 246), and possession

5

of a firearm by a felon (§ 29800, subd. (a)). The jury found true the special circumstance allegations that Smith committed the murder by shooting the victim from a vehicle and to further the activities of a criminal street gang in which he was an active participant (§ 190.2, subds. (a)(21), (a)(22)). The jury also found true the allegations that a principal personally and intentionally discharged a firearm causing death or great bodily injury (§ 12022.53, subds. (d), (e)(1)), and that Smith committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)).[2]

The trial court sentenced Smith to LWOP plus 25 years to life on the murder count, consecutive life terms plus 25 years to life on each attempted murder count, and a consecutive three-year term on the felon in possession of a firearm count. The court stayed the sentence on the shooting at an occupied vehicle count pursuant to section 654.

## DISCUSSION

### I. Jury Instruction on Duress

Smith contends the trial court violated his constitutional right to due process and a reliable verdict by refusing to instruct the jury that duress may negate premeditation and deliberation for the crimes of murder and attempted murder.

---

[2] The jury found Smith not guilty of one count of attempted murder and one count of shooting at an inhabited dwelling in connection with the Nickerson Gardens shooting.

## A. *Relevant Proceedings*

Based on the evidence that Smith had been threatened by his gang to participate in the shootings, the trial court instructed the jury on the defense of duress with a modified version of CALJIC No. 4.40: "A person is not guilty of a crime other than murder or attempted murder when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: [¶] 1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and [¶] 2. If this person then actually believed that his life was so endangered. [¶] This rule does not apply to threats, menaces, and fear of future danger to his life, nor does it apply to the crimes of murder or attempted murder."

The trial court denied Smith's request that the instruction be further modified to provide that "duress may not be a defense to murder[,] but it may be a defense to premeditation or implied malice." Citing *People v. Landry* (2016) 2 Cal.5th 52 (*Landry*) and *People v. Hinton* (2006) 37 Cal.4th 839 (*Hinton*), the court explained that duress does not negate malice, although it may negate premeditation to reduce a murder from first to second degree. The court concluded this concept was adequately covered by CALJIC Nos. 8.20 and 8.30, the standard instructions defining first degree premeditated murder and second degree unpremeditated murder.

## B. *The Trial Court Properly Instructed the Jury on the Defense of Duress*

On appeal, Smith argues the trial court erred in refusing to give his requested pinpoint instruction on duress because it was

7

an accurate statement of the law and supported by the evidence. He further asserts the instructions given by the trial court failed to adequately address the defense of duress because they did not explain that duress could negate the elements of premeditation and deliberation. We conclude this claim lacks merit.

"The trial court must instruct the jury 'on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 413.) A defendant also has a right to a pinpoint instruction on the theory of the defense. (*People v. Homick* (2012) 55 Cal.4th 816, 890.) The court, however, may properly refuse a defense instruction if it incorrectly states the law, is argumentative, duplicative, or potentially confusing, or if it is not supported by substantial evidence. (*People v. Bivert* (2011) 52 Cal.4th 96, 120.)

" 'The defense of duress is available to defendants who commit crimes, except murder, "under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." ' " (*People v. Powell* (2018) 6 Cal.5th 136, 164; see § 26.) Duress is not a defense to *any* murder and does not negate malice. (*Hinton, supra*, 37 Cal.4th at pp. 883–884; accord, *Landry, supra*, 2 Cal.5th at p. 91 [duress not a defense to murder and does not reduce murder to manslaughter].) Although duress does not categorically negate premeditation and deliberation, if a person obeys an order to kill without reflection, a jury might find no premeditation and thus convict only of second degree murder. (*Hinton*, at p. 884.) However, "this circumstance is not due to a special doctrine of duress but to the legal requirements of first degree murder." (*People v. Anderson* (2002) 28 Cal.4th 767, 784.)

8

A "killing 'upon a sudden heat of passion or other condition precluding the idea of deliberation' would not be premeditated first degree murder." *(Ibid.*, italics omitted.)  But "a malicious, premeditated killing, even under duress, is first degree murder." (*Ibid.*)

In *Hinton, supra*, 37 Cal.4th at pages 847 to 848, for instance, the defendant was convicted of first degree murder with special circumstances.  In addition to giving CALJIC No. 4.40 on the defense of duress, the trial court instructed the jury that when " 'a person commits a crime punishable with death, it is not a defense that he committed the act or made the omission under threats or menaces of immediate death or bodily harm.' " (*Hinton*, at p. 882.)  On appeal, the defendant argued the instructions erroneously prohibited the jury from considering whether threats to his life could negate the mental state elements of first degree murder.  (*Ibid.*)  In concluding there was no instructional error, the Supreme Court explained that the instructions "correctly informed the jury that threats and menace do not constitute a *defense* to murder."  (*Id.* at p. 883.)  The court also noted that "[n]othing in these instructions barred the jury from considering whether these threats—or any other facts— prevented defendant from premeditating and deliberating." (*Ibid.*)

Here, as in *Hinton*, the trial court properly instructed the jury on duress.  The version of CALJIC No. 4.40 given by the trial court correctly informed the jury that threats and menace do not constitute a defense to murder or attempted murder.  In addition, CALJIC Nos. 8.20 and 8.30 accurately defined the mental state elements of first degree premeditated murder and second degree unpremeditated murder.  There was nothing in the instructions

9

that precluded the jury from considering whether Smith acted without premeditation and deliberation in committing the gas station shooting. The jury was thus free to determine whether any threats made to Smith on the night of the shooting caused him to obey his gang's order to kill without reflection, thereby negating the mental state required for premeditated murder.

Smith nevertheless asserts that CALJIC Nos. 8.20 and 8.30 "did not fill this instructional void" because they failed to inform the jury that duress could negate premeditation and deliberation. (Boldface and initial capitalization omitted.) The Supreme Court rejected a similar argument in *Landry* because CALJIC No. 8.20 (deliberate and premeditated murder) instructs the jury that a killing upon a sudden heat of passion or other condition precluding the idea of deliberation is not premeditated first degree murder. (*Landry*, *supra*, 2 Cal.5th at pp. 93–94.) In this case, the jury was properly instructed with CALJIC Nos. 8.20 and 8.30, and found Smith acted with premeditation. There was no instructional error.

## II. **Cruel and Unusual Punishment**

Smith, who was 22 years old when he committed the crimes in this case, contends his LWOP sentence violates the federal and state constitutional bans on cruel and unusual punishment based on his culpability in the offenses relative to his codefendants and his status as a young adult offender. Because Smith failed to raise this objection in the trial court, he has forfeited the claim on appeal. (See *People v. Burgener* (2003) 29 Cal.4th 833, 886; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1247.) Even if not forfeited, the claim fails.

10

## A. *Governing Legal Principles*

A sentence violates the federal Constitution only if it is grossly disproportionate to the severity of the crime. (See, e.g., U.S. Const., 8th Amend.; *Graham v. Florida* (2010) 560 U.S. 48, 60; *Ewing v. California* (2003) 538 U.S. 11, 23.) The Eighth Amendment does not require strict proportionality between crime and sentence. (*Graham*, at p. 60.) Thus, " 'outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.' " (*Ewing*, at p. 21.)

A sentence violates the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424; see *People v. Dillon* (1983) 34 Cal.3d 441, 478; *People v. Avila* (2020) 57 Cal.App.5th 1134, 1145.) In making this determination, we (1) consider the nature of the offense and the offender; (2) compare the punishment with that prescribed for more serious crimes in California; and (3) compare the punishment with that prescribed for the same offense in other jurisdictions. *(In re Lynch*, at pp. 425–427; *Avila*, at p. 1145.)

" 'To determine whether a sentence is cruel or unusual . . . as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is "grossly disproportionate to

11

the defendant's individual culpability" [citation], so that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation], the court must invalidate the sentence as unconstitutional.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1300.) "We independently review whether a punishment is cruel or unusual, considering any underlying disputed facts in the light most favorable to the judgment." (*People v. Avila, supra*, 57 Cal.App.5th at p. 1145.)

Over the years, the United States Supreme Court and California Supreme Court have considered the degree to which the constitutional ban on cruel and unusual punishment limits the length of sentences that may be prescribed for juvenile offenders. "In a series of cases, our high courts have recognized that 'children are constitutionally different from adults for purposes of sentencing' because of their diminished culpability and greater prospects for reform. (*Miller v. Alabama* (2012) 567 U.S. 460, 471.) Hence, the Eighth Amendment's prohibition on cruel and unusual punishment has been held to prohibit imposition of the death penalty on juveniles (*Roper v. Simmons* (2005) 543 U.S. 551); [LWOP] on juveniles who commit nonhomicide offenses (*Graham v. Florida*[, *supra*,] 560 U.S. 48); mandatory LWOP on juveniles (*Miller*, at p. 460); de facto LWOP on juvenile nonhomicide offenders (*People v. Caballero* (2012) 55 Cal.4th 262); and a sentence of 50 years to life for juvenile nonhomicide offenders (*People v. Contreras* (2018) 4 Cal.5th 349, 356)." (*In re Jenson* (2018) 24 Cal.App.5th 266, 276.)

To "implement the limitations on juvenile sentencing articulated in these cases," our Legislature enacted section 3051 in 2013. (*In re Jenson, supra*, 24 Cal.App.5th at p. 276.) The express purpose of the statute was " 'to establish a parole

eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity.' " (*Id*. at pp. 276–277.) Section 3051 originally applied only to non-LWOP offenses committed before the offender was 18 years old, but amendments raised the age of eligibility to 25 years and included LWOP offenses committed before age 18. (*Jenson*, at p. 276.)

Section 3051 now provides that an offender who committed a "controlling offense" when he or she was under the age of 26 is entitled to a "youth offender parole hearing" during the 15th year of incarceration if he or she received a determinate sentence; during the 20th year of incarceration if he or she received a life term of less than 25 years to life; and during the 25th year of incarceration if he or she received a term of 25 years to life.[3] (§ 3051, subd. (b)(1)–(3).) An offender convicted of a controlling offense committed before the age of 18 for which he or she was sentenced to LWOP is entitled to a youth offender parole hearing during the 25th year of incarceration. (§ 3051, subd. (b)(4).) However, an offender sentenced to LWOP for a controlling offense committed after attaining the age of 18 is ineligible for a youth offender parole hearing. (§ 3051, subd. (h).)

---

[3] The controlling offense is the "offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

**B.** ***Smith's LWOP Sentence Is Not Cruel and Unusual Punishment***

Smith argues his LWOP sentence constitutes cruel and unusual punishment because it was grossly disproportionate to his culpability in the offenses relative to his codefendants. Smith acknowledges the "purposeful actions" of the group in hunting down and murdering a perceived rival gang member "deserves severe punishment."  He nevertheless asserts his conduct in the crimes cannot be deemed more culpable than that of his codefendants, Lawson and Bradford, who received significantly lighter sentences.

Contrary to Smith's claim, however, the constitutionality of his LWOP sentence does not depend on the length of sentences received by Lawson and Bradford, who, unlike Smith, entered into plea agreements for reduced prison terms in exchange for their truthful testimony.  In evaluating a cruel and unusual punishment claim, courts "need not rank every convicted defendant on a continuum of culpability and ensure each of their sentences are precisely matched to their particular culpability as compared to another defendant's culpability." (*In re Williams* (2020) 57 Cal.App.5th 427, 438 (*Williams*).) "Rather, the Eighth Amendment prohibits only sentences that are *grossly* disproportionate to an individual's crime."  (*Ibid.*)

Here, Smith's involvement in the crimes makes him uniquely culpable for the first degree premeditated murder of Cordero.  When viewed in the light most favorable to the judgment, the evidence establishes that Smith was the direct perpetrator of the brutal shooting that took place at the gas station.  Smith was the one who was armed with an AK-47 rifle. Smith also was the one who rolled down the window, shouted

14

"what's up, cuz," and then immediately opened fire at the occupants of a parked vehicle and a nearby bystander. Smith fired multiple shots at the unarmed and unsuspecting victims, killing Cordero and seriously wounding Chukwudi and Richmond. The attack at the gas station was the culmination of a spree of gang-motivated drive-by shootings that Smith and his codefendants perpetrated in a single night. While Smith's LWOP sentence was severe, so were his crimes, and based on the totality of the circumstances, the punishment was not grossly disproportionate to Smith's individual culpability.

Smith also asserts his LWOP sentence constitutes cruel and unusual punishment because he was only 22 years at the time of the offenses. Smith notes that the amendments to section 3051, which raised the age of eligibility for a youth offender parole hearing to 25 years, recognized "the maturity process does not end at 18 and in many cases extends to at least 25 years of age." (Boldface and italics omitted.) He argues the constitutional limitations on sentencing afforded to juveniles offenders, as articulated in *Miller*, *Graham*, and *Roper*, should also apply to young adult offenders, who, like Smith, were sentenced to LWOP for a crime committed when they were under the age of 26.

California courts, however, repeatedly have rejected the cruel and unusual punishment claim that Smith asserts here. Because *Miller*, *Graham*, *Roper*, and their progeny expressly limited their holdings to juvenile offenders, courts have declined to extend those holdings to young adult offenders sentenced to LWOP or its functional equivalent. (See, e.g., *Williams*, *supra*, 57 Cal.App.5th at p. 439 [two consecutive LWOP terms constitutional for 21 year old]; *People v. Montelongo* (2020)

15

55 Cal.App.5th 1016, 1031–1032 [mandatory LWOP sentence constitutional for 18 year old]; *People v. Perez* (2016) 3 Cal.App.5th 612, 617–618 [86-year-to-life sentence constitutional for 20 year old]; *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220–1221 [LWOP sentence constitutional for 18 year old]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [functional equivalent of LWOP sentence constitutional for 18 year old].)

As the United States Supreme Court explained in *Roper v. Simmons*, *supra*, 543 U.S. at page 574: "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. . . . [H]owever, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." While Smith contends this age demarcation should be reconsidered in light of the amendments to section 3051, we are bound by the decisions of our high courts, and the bright line they have chosen to draw between juvenile and adult offenders. (See *People v. Montelongo*, *supra*, 55 Cal.App.5th at p. 1033; *People v. Perez*, *supra*, 3 Cal.App.5th at p. 617; *People v. Argeta*, *supra*, 210 Cal.App.4th at p. 1482.) Smith's LWOP sentence accordingly does not violate the constitutional prohibition on cruel and unusual punishment.

III.  **Equal Protection**

In a related challenge, Smith argues section 3051 violates his constitutional right to equal protection of the law by denying him the opportunity for a youth offender parole hearing while

granting that benefit to other similarly situated offenders.  As with his Eighth Amendment claim, Smith has forfeited his equal protection claim by failing to raise it in the trial court.  (See *People v. Alexander* (2010) 49 Cal.4th 846, 880, fn. 14.)  However, even if the claim was not forfeited, Smith has failed to demonstrate an equal protection violation.

### A.    *Governing Legal Principles*

" 'The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws.' " (*Williams*, *supra*, 57 Cal.App.5th at p. 433.)  Persons who are similarly situated with respect to a law's legitimate purposes must be treated equally.  *(People v. Brown* (2012) 54 Cal.4th 314, 328.)  Equal protection of the law is denied only where no rational relationship exists between the disparity of treatment and a legitimate governmental purpose.  (*People v. Turnage* (2012) 55 Cal.4th 62, 74.)

We typically ask two questions to decide whether a statutory distinction is so devoid of even minimal rationality that it violates equal protection.  First, has the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner? (*People v. Chatman* (2018) 4 Cal.5th 277, 289.)  Second, if we deem the groups at issue similarly situated, does  the challenged classification ultimately bear a rational relationship to a legitimate state purpose?  (*Ibid.*)

"This so-called 'rational basis' scrutiny is exceedingly deferential:  A law will be upheld as long as a court can 'speculat[e]' any rational reason for the resulting differential treatment, regardless of whether the 'speculation has "a foundation in the record," ' regardless of whether it can be

17

'empirically substantiated,' and regardless of whether the Legislature ever 'articulated' that reason when enacting the law. [Citations.] A court may not 'second-guess' the ' "wisdom, fairness, or logic" ' of the law, and may invalidate it only if the challenger ' "negative[s] every conceivable basis" ' for the differential treatment." (*People v. Love* (2020) 55 Cal.App.5th 273, 287–288.) "We review an equal protection claim de novo." (*People v. Laird* (2018) 27 Cal.App.5th 458, 469.)

B. ***Section 3051 Does Not Deny Smith Equal Protection of the Law***

Under section 3051, subdivision (h), Smith is not eligible for a youth offender parole hearing because he was sentenced to LWOP for a first degree special circumstance murder that he committed when he was 22 years old. On appeal, Smith asserts that section 3051 denies him equal protection of the law because it makes him ineligible for a youth offender parole hearing as a young adult sentenced to LWOP, while extending that benefit to (1) juvenile offenders sentenced to LWOP and (2) young adult offenders sentenced to parole-eligible life terms. Smith argues that excluding young adult LWOP offenders from the provisions of section 3051 while including these other groups is not rationally related to a legitimate government purpose. We conclude section 3051 does not violate Smith's equal protection rights. Even assuming without deciding that Smith is similarly situated to these other groups of offenders that are entitled to a youth offender parole hearing under section 3051, the Legislature had a sufficient rational basis for treating the groups differently.

Our colleagues in Division Five recently considered and rejected the same equal protection argument that Smith raises in this appeal. (*Williams, supra*, 57 Cal.App.5th at pp. 433–436.)

In *Williams*, the defendant, who had been sentenced to LWOP for two special circumstances murders committed at the age of 21, contended the denial of a youth offender parole hearing under section 3051 violated his equal protection rights. (*Id.* at p. 430.) Like Smith, the defendant argued he was similarly situated to juvenile offenders sentenced to LWOP and to young adult offenders sentenced to non-LWOP terms. (*Id.* at pp. 434–435.) The court concluded the defendant was not similarly situated to either group because " '[c]hildren are constitutionally different from adults for purposes of sentencing' " (*id.* at p. 435, fn. 5), and a young adult convicted of special circumstance murder is "more culpable and has committed a more serious crime" than a young adult convicted of nonspecial circumstance murder (*id.* at p. 435).

The court in *Williams* also concluded the Legislature had a rational basis for excluding young adult LWOP offenders from parole eligibility under section 3051 while extending that benefit to young adult non-LWOP offenders. As the court explained: "The Legislature has prescribed an LWOP sentence for only a small number of crimes. These are the crimes the Legislature deems so morally depraved and so injurious as to warrant a sentence that carries no hope of release for the criminal and no threat of recidivism for society. In excluding LWOP inmates from youth offender parole hearings, the Legislature reasonably could have decided that youthful offenders who have committed such crimes—even with diminished culpability and increased potential for rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration." (*Williams*, *supra*, 57 Cal.App.5th at p. 436.) We agree with the analysis in *Williams*, and conclude section 3051's disparate

19

treatment of young adult LWOP offenders and young adult non-LWOP offenders does not run afoul of the equal protection clause.

We further conclude a rational basis exists for section 3051's disparate treatment of young adult LWOP offenders and juvenile LWOP offenders. In enacting section 3051, and in later amending the statute to raise the age of eligibility for most young adult offenders, the Legislature sought to provide a parole eligibility system that would take into account a youth offender's diminished culpability and greater prospects for reform. (*In re Jenson*, *supra*, 24 Cal.App.5th at pp. 276–277; *Williams*, *supra*, 57 Cal.App.5th at p. 434.) In excluding adults serving LWOP sentences for crimes committed between ages 18 and 25, the Legislature rationally could have concluded that these young adult offenders were generally more culpable and more dangerous to society than similarly-situated juvenile offenders. The Legislature also rationally could have concluded that young adult LWOP offenders, who had committed among the most serious of crimes after attaining the age of 18, were generally less likely than juvenile LWOP offenders to be rehabilitated. Because an age eligibility line must be drawn somewhere, the Legislature "could reasonably decide that for those convicted of LWOP crimes, the line should be drawn at age 18." (*In re Jones* (2019) 42 Cal.App.5th 477, 483.)

We acknowledge that section 3051's exclusion of young adult LWOP offenders from the benefits of the statute stands in some tension with the Legislature's recognition that advances in scientific research show that areas of the brain, particularly those affecting judgment and decisionmaking, do not develop until the early to mid-20's. (*Williams*, *supra*, 57 Cal.App.5th at p. 434.) Whether the Legislature should reconsider this statutory

exclusion, however, is a matter best left to its sound discretion. Our role is to determine if the Legislature had any rational basis for its sentencing choice, not to second-guess the wisdom, fairness, or logic of that decision. (*People v. Turnage, supra*, 55 Cal.4th at p. 74.) Because the Legislature had a constitutionally sufficient reason for denying parole eligibility hearings to young adults serving LWOP sentences, Smith's equal protection claim fails.

## IV. **Imposition of the Firearm Enhancement**

The trial court imposed an additional term of 25 years to life on the murder count based on the jury's true finding that a principal personally and intentionally discharged a firearm causing death or great bodily injury (§ 12022.53, subds. (d), (e)(1)). Smith argues that the imposition of the firearm enhancement on the murder count violated California's rule against multiple convictions and constitutional principles of double jeopardy. He further asserts that, to the extent federal double jeopardy principles have not historically been applied to multiple punishment within a unitary trial, the United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Sattazahn v. Pennsylvania* (2003) 537 U.S. 101 *suggest* that it now should.

As Smith concedes, however, the California Supreme Court has squarely rejected these arguments. (*People v. Izaguirre* (2007) 42 Cal.4th 126, 130–131; *People v. Sloan* (2007) 42 Cal.4th 110, 115–123.) We are bound by the decisions of the Supreme Court, and therefore, reject Smith's contentions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

21

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.

DHANIDINA, J.

We concur:

EDMON, P. J.

LAVIN, J.